Good morning, Your Honor. This is Richard Bonovideau on behalf of the appellant to the CITIES OF ARCADIA, is that all? Counsel, good morning. May it please the Court. Your Honor, that issue on this appeal is whether EPA acted contrary to law in establishing a TMDL, a total maximum daily load for trash for the Los Angeles River, whether they then acted contrary to law in vacating that established TMDL by EPA, and whether they proceeded further to act contrary to law in an excess of their authority in reviewing and approving a subsequently state-submitted TMDL. The way you introduced that raises a question to me. In other words, if you won everything you wanted, what would happen? Whose TMDL would be in effect, if any? It's a complicated question, Your Honor, because there is a state court action that was pending. We prevailed on some of the issues even that are before this Court. I guess what I'm saying is, if you knocked out the state-submitted TMDL, then you go back to the federal one, which the EPA's TMDL, which you have said is no longer, you're no longer attacking because it's moot or something. They have vacated that, yes, Your Honor. What would happen would be, if this Court were to grant us the relief that we're requesting, the EPA and the state would have to go back to the drawing board and figure out who's doing what. There would have to be a submission of the state TMDL to begin with, because EPA can only act if there's first been a submission by the state, either an actual submission or a constructed submission. So that would be the first step in the process. That's a form of attack on the EPA's right to establish the TMDL, even though you said that's no longer in the case. Yes, and we have discussed that. I can get into that now or we can get into it in a few minutes. No, that's all right. Go ahead and do your... Let me first say that what this case is not involved is whether trash is a problem in the Alley River and the Los Angeles Basin. It clearly is a problem. We all recognize that. The question is, did EPA act appropriately in access of their jurisdiction in trying to address this problem of trash in the Alley River? We believe that they have not, that their, what I would call post hoc explanations, are contrary to the plain language of the Act and are not supported by the record. Let me start off with the issue of ripeness. EPA has effectively argued that with respect to the issue of ripeness, what they are asking this Court to believe is that the State, even though the State waited 16 1⁄2 months past the initial consent decree deadline to submit a TMDL, an actual TMDL, and even though EPA was forced to proceed and establish its own TMDL, which, by the way, the interveners say that that EPA-established TMDL was effective and enforceable immediately, and even though EPA then proceeded to vacate their TMDL, they are asking this Court to believe that when they approved the State's TMDL, that the State's TMDL was not intended to be enforced in effect for 4 1⁄2 years after EPA approved the TMDL. And they make that argument relying upon primarily one declaration of Dennis Dickerson, that is the former executive officer of the Regional Board, on what the intent of the Regional Board would be with respect to future actions and what his individual belief would be in terms of how this TMDL would be implemented and enforceable. He claims that the TMDL would not be implemented and enforceable until the Regional Board turned around and actually amended the existing NPDF permit to include implementation measures within this TMDL, within the permit. That argument ignores the plain language of the TMDL itself that has expressed compliance dates, starting with the first year of implementation is to begin October 1, 2003. In fact, in July of 2002, the State adopted a regulation. And when you look at the codified regulation that the State adopted with respect to this TMDL and with respect to the implementation dates, the codified regulation, and this shows up at Title 23, California Code of Regulations, Section 3935, it says, quote, the implementation phase of the TMDL is scheduled to begin on October 1, 2003. So we're into the second year now, theoretically, of implementation of this TMDL. Do any of your individual cities know exactly what they have to do under it? We, the answer is yes and no. We know what is required, but again, we have a state court action that we prevailed on. That is on appeal right now. That obviously was just against the state and regional boards. But yes, I mean, the TMDL sets forth specific implementation measures. By the end of year one, that is by September 3, 2004, the cities are required to have reduced the amount of trash that is discharged into the LA River Basin by 10%. By September 3, 2005. That's a collective requirement, or is that each one has to? That is a collective requirement that applies across the board to all the municipalities that are impacted by the TMDL. See, I guess the, if I understood the mootness argument, and it sounded like they were saying, well, nobody knows, no individual city yet knows exactly how this is going to impact them, and so on. Well, they were saying in terms of financially, you can't tell us exactly how it's going to impact you, but we never even got to that point. Clearly, the TMDL has expressed compliance states. It's in the state's regulation. The question is, are we harmed by those compliance states, and is this thing effective and enforceable? They rely upon Mr. Dickerson's declaration, yet they ignore the language of the permit itself. The language of the permit itself, the regional board stated that this TMDL, this very specific TMDL would be effective and enforceable upon adoption and approval by EPA. That comes right out of the NPDS permit itself. Secondly, the regional board said that in the permit itself, they said, look, cities, you are required to comply with all water quality objectives. This TMDL is a water quality objective. There's no dispute about that. It is a numeric translation of a water quality objective. So, you have the regional board saying, number one, the TMDL is effective and enforceable upon EPA approval. Secondly, you have the regional board saying, and cities, you must comply with all water quality objectives. If you don't, it's a violation of your permit. Thirdly, you have the expressed compliance states in the TMDL itself. Now, what is the evidence that the case is not right? Well, it's Mr. Dickerson's declaration, who is not competent to actually testify as to what the regional board will do in the future and what the law provides for. And that's the only evidence that they are relying upon to suggest that this TMDL is not effective and enforceable. Are there any, I take it there are no enforcement proceedings that have been begun for violation of NPDES permit regulations? Not that I'm aware of, Your Honor. Having said that, however, the city should not be put into Hobson's Choice. They don't have to wait. It isn't a second part of the answer to my question. Even if either the, whatever the California Department of Environmental Quality is called, or EPA has not begun enforcement proceedings, don't private citizens have the right to bring civil injunctive relief for violation? And to recover their attorney's fees as well, Your Honor. Yes, there is an attorney fee provision in the Clean Water Act that provides that once citizens provide a 60-day notice, if the EPA or the State doesn't take action, that they can take action. I assume that's why Mr. Beckman is here. I assume that is the case as well, Your Honor. He's saying no, but we'll hear from him later. Finally, Your Honors, on the issue of ripeness is the procedural violation. EPA does not dispute the fact that, nor did the interveners dispute the fact, that there was a clarification memo that came in two days before EPA approved this TMDL. This clarification memo was never, never came to light during the two hearings before the Regional Board, never came to light during the two hearings before the State Board. Two days before EPA approved the TMDL, and this is now late July of 2002, this memo is submitted from the State to EPA. This memo significantly expands the scope of this TMDL. There was no notice, there was no opportunity to be heard, and to comment on this clarification memo. This Court has found that a procedural violation upon the date of violation creates, causes the case to be ripe and the fact that the case can never be riper. EPA's argument in response is, but that wasn't our job. That was the State's job. We would beg to differ for two reasons. Number one, EPA's approval of August 1, 2002, expressly relied upon and commented that the State had provided the public complete, adequate opportunity to review and comment on the TMDL. Secondly, the whole purpose of having the EPA review and approve the State's TMDL is to make sure the process was properly complied with. If improper notice or no notice is provided, that is an immediate procedural violation that causes this case to be ripe, and we would suggest that the District Court erred in determining that this case was not ripe for review. Secondly is the issue of what we call EPA's authority to approve a TMDL for an unlisted water body, and that is the Los Angeles River Estuary. The first time we see this issue pop up in the record is, again, this clarification memo. After all the hearings, two hearings before the Regional Board, two hearings before the State Board, we see this clarification memo, and by the way, we didn't see it until after EPA approved the State's TMDL. There is this clarification memo that effectively says, oh, by the way, there is a Los Angeles River Estuary. That is not a listed water body, but we want to have this TMDL applied to the Los Angeles River Estuary. And EPA's response to that is, but we have the authority to review concurrent submissions, both of a TMDL and a request to list the water body. That may, in fact, be the case if they have the ability to do so, but a TMDL can only be established for a water body that is first listed on the State's 303D list. That shows up in two different locations within the Act. It's clearly within the Act. Is there a difference between an estuary and a drainage basin? I mean, I understand estuary to essentially mean the entire Los Angeles River Basin. Am I missing something? Yeah, the estuary is actually towards the back end of the Los Angeles River, and it's not technically part of the, quote, Los Angeles River. What they did was they specifically, the State had specifically identified various segments of the water bodies that were to be covered that were already listed as impaired. And the LA River Estuary is a separate segment, a separate water body by definition. They failed to include this LA River Estuary within the TMDL. And I think it's depending upon the rainfall. The estuary may or may not have water in it at various times of the year. Is that correct? I believe that's true, yes. It could have occasional pools in places, but not necessarily a free-flowing stream. It would depend on how close the estuary is to the ocean. I think the estuary is fairly close to the ocean. I would be surprised if there wasn't water most of the time in the estuary. But the point of the matter is the estuary was never listed. It's a separate water body that was never listed under the Clean Water Act. What in the act keeps them from listing and establishing TMDL the same day? I believe that they could actually do that, but they would first have to approve the listing of the estuary first, because the Clean Water Act says TMDLs are only to be... What do you mean by listing? What if they just say this is impaired and cite the statute and so on and declare it's impaired? No, because there's a whole separate process that applies for listing. The state has to first go through and evaluate all the water bodies, then determine whether water bodies are being impaired. If so, how they're being impaired, and then rank those water bodies. And the Clean Water Act says the TMDLs are to only be established after the state has gone through the process and only for water bodies that are first listed on the state's 303D list. So the state goes through this process. They develop this list of impaired water bodies. They submit it to EPA. So it's a similar process to the TMDL development process. They have to first determine which water body is impaired, what they are impaired with, and then submit it to EPA. I guess a few in your sentence is first, and how much first. I think what EPA is saying is we can approve their impairment designation simultaneously with the TMDL that they submitted to deal with it. Well, and I don't necessarily disagree with that. It could be a minute later. But here's the problem in this case. And that is their argument. In this case, however, if you look at the record, if you look at the submittal letter by the state,  their array line is, quote, Request for U.S. EPA approval of total micron data loads for trash in Los Angeles River and Bologna Creek watersheds. No reference to having the water body listed as being impaired. Secondly, the first sentence of their letter says, and this is their submittal letter to EPA, which EPA acted upon, Pursuant to the Federal Clean Water Act Section 303D-2, the State Water Resources Control Board is submitting total micron data loads for trash in Los Angeles River and Bologna Creek watersheds for the U.S. Environmental Protection Agency's approval. No similar statement was made with respect to listing the water body itself, the LA River estuary. Similarly, in EPA's approval, EPA expressly approved the TMDL stating, quote, The TMDLs are hereby approved pursuant to the Clean Water Act Section 303D-2. No statement was made about approving the estuary as a listed water body. There is a whole process that applies. That process was not followed. They can say, yes, we can do it concurrently so long as the impaired water body is first listed and then the TMDL comes behind it. But they didn't do it here. They didn't follow any portion of that process. There was no notice given to the public of the attempt even to list the water body, the estuary as impaired. And the public is entitled to an opportunity to review the listing process, what is being proposed, what pollutants are being proposed, as well as the TMDL that's being proposed for that water body. This clarification memo, in addition, attempted to expand the TMDL to not only the estuary but to a series of unidentified tributaries and, in fact, to the entire 584 square miles of the watershed. In effect, you can have a single bubble gum wrapper, and that was an example that was used in the administrative proceedings, that is in a gutter or public street three miles away from the LA River, and, in fact, the municipalities would be in violation of their permit and liable for dealing with that one bubble gum wrapper. Now, EPA's argument is, well, but we only apply the waste load allocation aspect of the TMDL to the entire urbanized portion, not the TMDL itself. Well, that's a distinction without a difference because, in this case, the waste load allocation vis-a-vis the cities is the only thing that we're obligated to comply with. Secondly, if you look at the definition of waste load allocation, and I'm quoting now from the regulations, this is 40 CFR 130.28, it defines a waste load allocation as the portion of a receiving water loading capacity. So, the portion of a receiving water's loading capacity is allocated to one of the existing or future point sources of pollution. So, it's tied directly to the receiving water. The waste load allocation is to be developed for the receiving water, not for the entire 584 square miles of the watershed. Beyond that, you also have the U.S. Supreme Court's decision in Swank which says the Clean Water Act is supposed to be applied to waters of the United States. Clearly, it can't be applied to non-waters, it's not... Yeah, but they were dealing with something that never had any connection or effect on interstate water. I mean, that was the problem it seems to me in Swank. True, fair enough. But the point is, you still have to have water. And here, the waste load allocation has to be developed for the receiving water. That's right out of the regulation. The TMDL can only be applied to the receiving water. There's no basis anywhere in the Clean Water Act to apply a TMDL to the entire watershed. The TMDL is the limit that can be discharged within the water body. It says nothing about a limit that is to be applied to public streets before it even gets close to the water body. How are you going to clean up the L.A. River if it isn't extended throughout the whole basin? Well, the way to do it and the way that it's being proposed is to put various nets, capture devices, etc. either within the municipal drainage system or in certain cases prior to the municipal drainage system. The problem is that... And you sweep the streets. Exactly right. To educate the public. Exactly right. All those things will be done and are being done. But to say that if a single piece of trash, 10 years from now, ends up in the street, never made it to the river itself, that we're in violation of our permit, that's inconsistent with the Clean Water Act. They can impose limits... We'll wait for that case. Well, but the question here is does EPA have the authority to approve a TMDL that was not developed in accordance with the Clean Water Act? The TMDL process, as set forth under the plain language of the Act, says that TMDLs are to be developed for listed waters. But, Mr. Montevideo, I have the same concern Judge Craigerson has. If you're talking about eliminating trash from the Los Angeles River, what's wrong with regulating the sources of the trash? If you know that trash in a storm drain is likely to end up at some point in the waterway, why does the Clean Water Act prohibit EPA from issuing regulations to try and prevent that source of pollution from making it into the water? I don't say it completely prohibits, but in the TMDL context, when you're dealing with the actual amount of pollutant that's leaving the point source, leaving the pipe, leaving the municipal storm drain system and being discharged into the river, that is what the TMDL is supposed to be focusing on. Is it your argument that because you can't navigate a boat down Sunset Boulevard that the reach of the regulation doesn't extend that far? Isn't that what you're really saying? No, no, I don't believe so, Your Honor. Our argument is we cannot be held responsible for that one bubble gum wrapper that's sitting in the public street, at least under the TMDL requirements. The TMDL says you can't discharge it into the river. That's 100 tons of bubble gum wrappers because your client cities don't clean their streets and therefore let all that stuff get into the river. It may be a violation of the permit, but not this TMDL. This TMDL is supposed to be designed expressly to clean up the LA River. If we can put in a net, for example, that's cost-effective and that prevents trash that may be in the streets from getting into the river, then we should be permitted to do that, at least under this TMDL. If we can sweep our streets... How do you say you're not permitted to do that? You know, I was walking with my brother-in-law in Beverly Hills and I'm pretty conscious of storm drains and sewage systems and all that because I've worked on those for many years. And the first time I saw a net in a storm drain, I thought, well, maybe somebody's stuck in there. And I got to look and then right on top there's a little... It's an entryway. We can clean it up. So I thought that was a pretty good idea. It is a very good idea. But how about the piece of trash that's in the sidewalk? Are we responsible for that? Well, you need to clean the streets because if you don't, it's going to end up in the ocean. Agreed. But how about the sidewalks? Well, if it's on the sidewalks, it's going to end up in the ocean. How about on somebody's driveway? Are we legally responsible under this TMDL? Well, if it's on their driveway, then they should pick it up. And then you need to educate them that they don't hose the driveway because then the water, it's all going to end up in the ocean. Of course it does. But the question is this one of fairness. Are these municipalities, should they be subject to a citizen suit? Because somebody spotted some trash on the sidewalk or in somebody's front lawn or in a private driveway. Are we responsible for dealing with, for preventing people from littering anywhere in the entire 584 square miles of the watershed? That's not what the Clean Water Act says. The Clean Water Act says vis-a-vis the TMDL process, the waste load allocations are to be applied to the receiving water. That's what this whole process is about. I think your argument may be a good one about how the regulatory authority ought to be applied. But I don't know that it's as good an argument that it cannot exist. Regulatory authority over those areas cannot exist. In the TMDL context, Your Honor, is our point. They have exercised certain jurisdiction over non-waters under the permit. But with respect to the TMDL, that's the focus, that's what this lawsuit is about. Can they require us to prevent trash from ever being on a city street, a sidewalk, private property? Maybe that is the part of it that's unripe. I mean, we don't know how the state's going to do all this. But I'm not sure that, well, all right, your argument, I don't know if your argument goes as much to the content of the TMDL as it does to the adoption of ATMDL. Well, at this point, it's going to primarily to the procedure. We never were able to get into the merits of either TMDL because this case was disposed of on a 12B motion. Well, and you're suing the EPA, which really doesn't administer the TMDL. We are challenging what they have approved. We are challenging their action. That brings me to my final point. We have alleged that you represent the city of Arcadia? Yes. Yes. How much is this thought to cost the cities? Well, the numbers that are within the TMDL itself, to achieve full capture, the regional board's numbers were $2 billion. How much? $2 billion over the next 10 years and $180 million per year thereafter. And that is just for one pollutant trash and for one water body at the LA River, not the estuary. The estimates that the regional board came up with, and that's in their TMDL report, which is a document that we submitted in the evidence at the trial court level. The trial court on her own motion excluded that evidence. It's a public document. It has independent legal significance. That document says in order to be in compliance, to be assured that you're in compliance, you have to put in full capture devices throughout the basin. If you want to make sure that you're really in compliance. And that will cost, they've estimated, these are their numbers, $2 billion over the next 10 or 12-year implementation period. Plus another $180 million for the whole basin. But just for the LA River. LA River. Just for the LA River and just for trash. So, the economics are astronomical, but we never even got that far at the district court level. The district court did not allow us to get into the meat of the TMDL because she dismissed it on the grounds of rightness, and she did address one legal argument, and that was whether the EPA had the authority to approve a subsequently submitted state TMDL. And I'd like to spend a few minutes, if I could, to go there and talk about that issue as well as the TMDL procedure. The TMDL procedure, we have argued that there was a procedure that was flawed that was followed by EPA in this case. The trial court said there's no final agency action, therefore you can't challenge the procedure. In fact, the TMDL procedure is made up of three separate final agency actions by EPA. Number one, the decision by EPA to proceed and approve established, I'm sorry, a TMDL on their own, sui sponte, without the state ever submitting an actual submission to EPA or without there ever being a constructive submission, meaning nothing was submitted and it was delayed in the submission. Secondly, EPA then proceeded to vacate that TMDL, so a second final agency action. And thirdly, EPA proceeded to then approve a subsequently submitted state TMDL. And we're challenging the bookends of this TMDL process. First, we're saying that, look, EPA only has jurisdiction and authority to itself develop the TMDL after the state has made a submission to EPA. That comes right out of the regulations. This court has said, okay, if there's an unreasonable delay, however, in the state making a submission, that is a constructive submission, and at that point the EPA has a mandatory duty to proceed and itself establish the TMDL. There was a long delay here, wasn't there? I'm sorry, Your Honor? The state did delay. The state did, you know, under the consent decree, they didn't meet the deadline. They did not clearly meet the deadline, but here's what actually happened. The state had already approved the TMDL. The only thing, it had gone through the regional board level, it had gone through the state board level. The only thing they were waiting on is for the Office of Administrative Law to approve the thing. So EPA stepped in in the middle of that, and we know it's months away. First they had a deadline of their own to meet. But then the question is, still, whether or not they had a deadline in the consent decree, the Clean Water Act still applies. Under the Clean Water Act, it is very clear. It's an either-or process. The state is given the opportunity to first establish the TMDL. If they don't do so, EPA then has to review an actual submission, and if they disapprove it, itself establish it, or they have to review, in effect, a constructive submission. This court, in the San Francisco Baykeeper v. Whitman case, actually found that, in that case, because the state was in the process of developing the TMDLs, there was not a full and complete failure to develop the TMDL. When you're months away, the thing has already been approved. Clearly, they cannot argue that there was a constructive submission. And, in fact, there's nothing in the record where they have made a finding that the state had unreasonably delayed. So, we would submit that EPA's action in establishing the TMDL on its own accord, sui sponse, is inconsistent with their authority under the Clean Water Act, and that the district court erred when determining that the TMDL procedure was not challengeable in not allowing us to move forward with that claim. Finally, is the issue of EPA's approval of the state's TMDL. And the process under the Clean Water Act, under Section 303D, is, again, an either-or process. It gives the state the opportunity to establish the TMDL. If the state fails to do so, or delays or submits a defective TMDL, at that point, EPA is to step in and establish the TMDL. Once EPA establishes the TMDL, it has 30 days, by the way, to do so. Congress is very clear with that. And Congress also said, once EPA establishes the TMDL, the state has an obligation to incorporate the EPA-established TMDL into the continuing planning process. So, the statute is pretty clear. Now, what it doesn't say, what EPA is arguing is, okay, even though we established our TMDL, we could, at any time, look at the state's TMDL. Or, if that's the case, Congress would have put some provision in there that says, If EPA is disapproving the TMDL, they can remand it back down to the state to review. Or they can provide an opportunity for the state to revise the TMDL. Congress didn't say that. And to interpret this Clean Water Act, as EPA would suggest, would be effectively to render meaningless the provision of the Clean Water Act, where Congress says, once EPA establishes this TMDL, state, put it in your continuing planning process. Under their theory, the state need not take EPA's TMDL and put it in their continuing planning process. Secondly, it would effectively render meaningless the language within the Clean Water Act that gives EPA and requires, as this Court has held in the San Francisco Baykeeper case, requires EPA to establish the TMDL if the state fails to do so. Because at that point in time, the state hasn't done their job. EPA picks up the process and says, OK, we're obligated by the law to develop this TMDL. It would render that process completely meaningless for the state to say, Oops, we're sorry, we'll fix it. Well, by then, the state has already established it as they were required to. And secondly, the state would have been required to actually incorporate the TMDL into their CPP, their continuing planning process. So the theory that they can approve a subsequently submitted state TMDL, once the feds have exercised jurisdiction, flies directly in the face of the clear language of the Clean Water Act. And the states could never again after that ever submit that TMDL. I wouldn't say that, Your Honor. And by the way, that is, in this case, there is no new facts or changed circumstances that justified the state's position. There's no evidence to say, look, we need to come up with something different because there's been a change in circumstances. If something else came about where it required potentially a re-looking at the TMDL, you're dealing with EPA's TMDL. So the state would be, it would be their burden to go back to EPA and say, OK, we think you guys need to make a change to your TMDL. Here is some additional evidence to consider. But remember, at that point, we're dealing with EPA's TMDL. So it's going to be up to EPA to make a decision whether or not the evidence that the state has submitted, belated as it may be, justifies a change in EPA's TMDL. It's not, that's not the case in this case because- I thought, I thought maybe we'd be just dealing with a new state. I mean, there is something in the act saying that the EPA has to entertain state, and it doesn't have any time limit or any- That is correct, Your Honor. At the initial phase. But that language is prefaced with the state shall establish the TMDL. You only make it to the EPA's level once the state has failed to do so or has submitted a defective TMDL. But then the act says EPA, once they have the mandatory obligation as this Court has found, once EPA has that mandatory obligation to itself establish the TMDL, the statute then says the state must or shall, I should say, incorporate EPA's- Because the only effective TMDL at that time is the EPA one, and obviously they want it to be effective. I don't know that Congress in establishing a system where the states are supposed to do most of the administering would want, they want to make some provision for a state that is laggard, but I don't know that they want to say if you're laggard up to a certain point, you lose the power to act ever after. You just have to follow the EPA's TMDL. Well, again, not the case in this case because there's no changed circumstances, but I would argue that Congress did give EPA or give the state the initial opportunity. At the same time, Congress was concerned. They wanted to have these TMDLs developed sooner rather than later to clean up the water. So, the state then fails to do its job. At that point, EPA picks up the responsibility. Is it to say that the states never can get back in the process? No, but you're now dealing with an EPA-established TMDL. So, they're asking that EPA amend or modify its TMDL. I think I understand. I understand your argument. Thank you, Your Honor. Thank you. Thank you. May it please the Court, my name is John Bryson from the Department of Justice representing EPA, and with me at the counsel table is an EPA Regional Counsel Attorney, and Mr. Beckman represents private intervenors who intervene in the case as defendants. And I'm going to take 16 minutes of the 20 minutes, and Mr. Beckman is going to take the remainder. And our main commission here is that the district court was correct in dismissing the case for lack of rightness, and, in fact, that judgment should extend to the entire case. The four claims that the municipalities present have no issues that are fit for review at this time. As this Court has recognized in the Pronsolino case, the TMDLs are not self-implementing, and the MTDS permit has to be amended in order to make them effective. Is that the answer to my question, then, Mr. Bryson? In other words, no one could actually bring a regulatory action or a private citizen under the existing? I think the municipalities would have a defense, because the permit says that the implementation will be through the stormwater quality management plan, and even though the permit says that they have to, they can't do anything that causes or contributes to a violation of the water quality standard, the permit also says that that requirement is implemented through this plan, and that has to be amended. By adoption of the TMDLs, though, hasn't the plan been amended at least to the point of adopting that as the pollution standard? Yes, as calculations. It's taken the narrative standard, which was trash that would impair the beneficial uses, and then established calculations for each point source, their allocation of how much pollution would they have to reduce, I think. But the implementation phase is yet to come, and that was established here by the evidence of the executive officer of the regional board. But I'm still not convinced that the cities are not right now at risk, at least to have to litigate the question of whether or not they are or are not in compliance. Well, that wouldn't be the test for readiness, because the hardship test is do they face a compliance obligation or risk penalties for noncompliance. Your position is no, because even if such a suit were brought, they would have a defense that should result in a dismissal of the action as premature. Right. But it's also because the permit, the TMDL, and the declaration of Mr. Dixon established that at least there's a monitoring phase here which has to be completed, and although the monitoring. But I understand the monitoring, and you'll have to forgive me because I am no expert on clean water law, and I'm not sure I understand all of the different stages of review that have to be accomplished here before everyone will agree that these regulations now are fully applicable. But I understood your briefing to mean that the monitoring process is essentially fine-tuning the TMDL limits so that they can be changed if necessary, if they turn out to be unreasonable or too stringent. That's right. And it's unrebutted here that the Board is going to listen to proposals to do exactly that. In the meantime, the TMDL says that the municipalities are in compliance as long as they observe that they are in compliance with already otherwise applicable regulations that apply to litter and disposal and things of that nature. So what does that mean with regard to this timetable that Mr. Montevideo was talking about? I mean, as I understand it, some of those deadlines have already passed. Well. Achieved a 10 percent reduction by October of 2001. No, because if you look at extra –  because the TMDL says that – at Excerpt of Record 165, which is in the TMDL, it says, During the baseline monitoring program that occurs prior to the commencement of the implementation phase, cities will be deemed in compliance with their waste load allocations to provide all the trash collected during the monitoring program is disposed of in compliance with all applicable regulations. In other words, as long as they pick up something and properly dispose of it, that's okay? That's what this says, yes. And so the monitoring is completed, which was scheduled for – If the monitoring takes two or three years, does that mean that then there has to be a 30 percent improvement suddenly? In other words, they don't start again at zero. Here, yes. They would have to be – they have to meet that – What I understand – No, no, 30 percent. It says 10 percent in the third year. Excerpt of Record 166. It'd be 10 percent in the – In the third year. And then – but they'll click in at the third year, or maybe the fourth year. That's right. But it is dependent on the baseline monitoring phase being completed. I guess the hardest thing I have with the ripeness argument is to connect it with the legal issues being asserted against EPA. It doesn't seem to me that they're going to get any riper. If they were attacking something that the state was going to do to them down the line, that would be one thing. But they're really attacking the authority to do this in the first place. And it's kind of a basic structural legal question. And I don't know that the record's going to get any better on as time goes on. It is a legal question, but not all legal questions are automatically right for review. Oh, I know that. But very often, one of the considerations is that you want to decide something on a more fully developed record. And I just – that, at least, is not a consideration now. So if that's not the problem, then you have to say, well, this just isn't enough of a threat to the cities, and this can all be litigated in two years. Right. That's correct. And we won't know anymore about these issues in two years, but then we'll know the cities are being hurt. Well, Your Honor, we will know at that point. We'll know what it is that's actually happening to the cities. And you might have a different set of plans or a different set of claims. The legal issue may not matter anymore under some scenarios. Well, under some scenarios, you mean that some of the cities might not. Right, Your Honor. But as long as one city, it seems to me, you've got a group of cities, one of them's got a right claim in standing to bring it. But it's the uncertainty that's involved here. I mean, and the lack of hardship while we're waiting to see. And that's our submission here. They have to show that they really faced this Hobson's Choice, and they failed to do that.  Hobson's Choice is restructuring their everyday business behavior about how they run their city in accordance with the permit as incorporating the waste load allocations or defying that and then facing enforcement penalties or things of that nature. That's the classic Hobson's Choice. You mean how the equipment they use and how they schedule the use and how they check the storm? There's no question that once this all becomes fully effective, it's going to cost something. The cost figures that have been thrown out here are really not showing in any that you've represented. I don't know that that's a Hobson's Choice. I mean, that's between a rock and a hard place. Hobson, you know, you can have any horse in the stable, but you've got to take the first one. I don't know about horses. You can try stilla and charybdis if you'd like to go there. Yeah. I think if you write some of these. You could run into the creek still. Yeah. Well, we'd have to rewrite some of the opinions and write those, I think, because they use the phrase Hobson's Choice. You're right. But on the cost, what the TMDL did. Is there federal money to help with the cost? I don't think there is now, but I don't really know the answer to that. To follow up on Judge Ferguson's question, what does the city of Arcadia do in the interim? Do they have to go out and buy the nets for the storm drains? Do they just keep having the street department sweep the streets on the same schedule every Tuesday and Thursday? Your Honor, I mean, presumably they have to do some planning for the possibility of eventuality, but the point here is that they produce no evidence that they have to do that. They haven't shown what they think they have to do and what it would mean to them personally. What do you think they have to do? I don't know. Eventually they would have to meet the allocations. They have to be able to have some systems in there. What do you think they have to do? I mean, we're living in a real world. Well, the TMDL describes possible ways of compliance here, which are to put these nets and catch basements and such like that. I heard that they're not that effective. Well, I think the TMDL finds that certain types of them are very effective and that certain types are less effective, but in combination with institutional controls can be effective and so on. If they have to start doing that because of the TMDL, why isn't the case right? Because they haven't shown, they haven't put in any explanation of what it means to them to have to do this. The rightness here is based entirely on the language of the permit. But they tried to tell the district court, hey, this is going to cost us $2 billion over the next 20 years plus another $180 million a year. What they relied on were cost estimates at the high end, which were placed in the TMDL, and there was a whole range of cost estimates, which was put in there for the purpose of apparently satisfying state law requirements that the board show what possible costs would be. But didn't EPA adopt the state TMDL? Excuse me. Didn't EPA adopt the state TMDL? No, EPA did not approve the analysis of that cost. EPA's approval is under 40 CFR 130.7C, which identifies the minimum requirements for a federally accessible TMDL. And a cost analysis is not part of that. It's that they have the waste load allocations and they have the margin of safety and so on. There's no, this cost analysis said nothing about any particular city or what their particular problems might be. And the plaintiffs here made no attempt to put anything like that in the record. They tried to offer cost information, but Mr. Montevideo said the district court rejected it. They don't want to hear anything. What the district court said was that the cost information they relied on, which is what was in the TMDL, doesn't show anything about cost for particular plaintiffs. And consequently, it doesn't, it's not sufficient showing in order to establish that it's right. So the evidence was not confident? It was an evidentiary ruling excluding it from the record? Yes, that's correct. And it's not confident evidence? That's right. I mean, she said it was inadmissible here. I said what she also said, even if it is, it doesn't prove what they claim. So how did this case get up to the Northern District? It was originally filed in the Central District. I guess it's one here. The Consensus Treaty that governs this, governs EPA's actions, was in front of Judge Armstrong in the Northern District. And so the government moved to transfer to Judge Armstrong, and the district court here did that. That power was transferred to Judge Armstrong in the Northern District, and the basis for that was that she was administering the consent decree. That's how it came there. That's relatively cheap, isn't it? Two million dollars? Two million dollars just to clean up the L.A. watershed? Well, I have no way of judging how reasonable that was, what the cause is, Your Honor. My point is that they haven't really made their case showing that they have a hardship here that would justify finding this to be right. But in the estuaries, is that right? You're talking about Bologna Creek and places like that? Well, the TMDL for Bologna Creek was separately established and was not challenged by anybody who was affected by that. I forget that big net that goes across. I haven't been there, Your Honor, so I can't say. Careful, Mr. Bryson, you're up against local knowledge. I'm known in this area as the sludge judge. I am. I'm proud of that title. Who's going to deal with the non-rightness issues? Well, I can address some of them really quickly before I lose Mr. Beckman's time. But the statute says very clearly the EPA has a mandatory obligation to approve a TMDL that's submitted by the state, and that's what happened in this case. And there's nothing in the statute or any regulation that says that there's an exception where EPA had established a TMDL itself. And that's EPA's interpretation of it. It's a reasonable one, and it's housed a deference in this court. Now, the estuary, the estuary is the area where the river spills into the ocean down in Long Beach. And the TMDL describes how all the trash piles up in the estuary, and that's where it comes down. So what this regional board did was to identify the estuary as impaired. And it's a regulation that sets up a process by which the state can make identifications, and that's through the listing process. But there's nothing in the statute or the regulations that says the state can't make the identification, which is the statutory phrase, in some other manner. And that's what they did here, and that's what the explanation was in July of 2002. And contrary to the representation here, on page 118, the EPA letter approving the TMDL also expressly found that the state's And the third point there is that there's nothing in the statute and there's nothing in the regulations that says that the identification has to be done through a notice of comment process. There's nothing that admits that requirement. The only thing that applies to the, as a matter of federal law, to the TMDL process is the EPA's regulation, which says that the calculations that are in the TMDL, in other words, the derivation of the numerical limits, have to be open for public review. And that happened for this TMDL. It was open for proposal before it was approved. So there were no violations of the procedural merits. And the last point is the misunderstanding here about what the so-called effect on the urbanized watershed is. The point here is that the storm drain are the entryway into the point source discharges. And so that's what, and they belong to the municipalities, And so they're responsible for what happens when the trash is discharged. And so, and all those discharges have to be permitted. And what the TMDL does is say, in order to ensure that the receiving water meets its water quality standards, you're going to have to stop the trash in some way. And this is, and the TMDL identifies the storm drain as where you stop the trash. And suggests that you, that's how you comply. And I'm going to leave the rest of my talk to Mr. Becker. I may have to leave the court. I'm David Beckman, representing Hilda Bay NRDC and the Santa Monica Baykeeper in this action. And I'd like first to discuss the consent decree in this action briefly, because Mr. Montevideo, I think clearly in oral argument, has interjected the allegations of EPA under a separate court order. Not this case. And not the order dismissing his action into this case. And I want to make sure that the court is aware of the fact that there is, I think, a collateral attack being made on the consent decree. And that collateral attack is based on the fact that Mr. Montevideo is arguing to you that there's something wrong with the first EPA established TMDL. Now, as a first factual matter, that TMDL is not being challenged by the second amended complaint. And I don't know why this came up in oral argument. The district court decision on page 13 made it clear that during the district court proceedings, there was multiple amendments of the complaint. And at the end of that process, the EPA established TMDL required by the consent decree in the separate Hilda Bay case was not being challenged. And so this notion of constructive submission and EPA's obligations under the consent decree really should not factor into the decision in this matter, because the EPA approved TMDL is not at issue. Rather, it's the subsequent state TMDL submitted, which was not required by the consent decree, which is being challenged in this action. But since this has been raised, I want just to make sure that in any discussion that might occur in this opinion, that you are aware of the following reality, which I'm sure you are. You cannot collaterally attack a consent decree. The cases are this high in every circuit of the United States Court of Appeals. That's not, that's verboten. You can't do that. But even if you could, the theory here that constructive submission has to be recognized or EPA has to wait for the state that was deficient in the first place, which is why the consent decree exists, they have to submit a TMDL. It's simply untrue. The Sierra Club v. Miber case in the 11th Circuit. If you did it that way, nothing could ever get done. Well, exactly. And if you could come back after the fact and attack consent decrees six years later in separate proceedings, we'd have a mess of a judicial system. But I just wanted to point out that the Miber case in the 11th Circuit explicitly looked at whether constructive submission applies when an EPA conduct is governed by a consent decree. And they said, of course it doesn't, because what applies there is you have a court order. And court orders have to be lived up to. The consent decree in the separate action here governs EPA's obligations under the Clean Water Act. And the argument that anything else occurs or that some background Clean Water Act analysis now applies should be assuredly rejected, we would request in this decision. Now, I want to talk about the rightness issue briefly, not about the points that Mr. Bryson mentioned, but about something which I think is dispositive and which distinguishes this case from the facts of all the other cases that the parties have cited to you. And that is that in this case there was a guaranteed re-opener, guaranteed not only by the regional water administrator here, the regional board, but by the overarching state water board, which is sort of like the equivalent of the Court of Appeal in the state administrative system. Now, this is in the record in multiple places cited in our brief. The date said, the water board said, before any compliant obligation is triggered, before the first compliant state in September 2006, we guarantee that we will reopen this matter and look at the system and look at what your allocations are. In fact, the allocations were not set by the TMDL that applied to each specific city. There was a whole calculus, which if you read the record, the TMDL goes through and it's a mathematical formula about what actually each city has to do. So, before any city could be held to have violated a deadline, before any citizen group could conceivably, rightly or wrongly interject themselves into this matter, there's a re-opener. And that's very different from all the other cases. And I think it's probably the best basis on which this Court should uphold the district court's ruling on rightness. Because as environmental organizations, we're sensitive to the fact that reasonable access to courts at early junctures is important. And we certainly don't want the Ninth Circuit, you, to write a decision saying that you have to wait until some lengthy time when a TMDL has been issued. But in this circumstance, where the only rightness allegation, or rather the only harm allegation, is the cost of compliance, it does become relevant to wait for the cost to be sufficiently fixed by the subsequent proceedings before the case is right on the harm prong of the rightness assessment. Do you think they're likely to have a re-opening that says, well, the TMDL is no longer zero? It's possible. I don't know. It's very hard to assess what will happen. But I think it's telegraphed in the record that it may be that after the underlying baseline monitoring occurs, which was going on over the last few years, that they'll find that allocations might be very different than just what the presumptive one is in the TMDL. And that possibility is a real possibility. And it exists. And that decision will occur before compliance is due. So even if, Your Honor, they decided that we're going to leave it all just like we had it, there's still the opportunity, and the district court decision preserves the opportunity for these plaintiffs to come back to the district court and say, okay, we're back. We have the problem that we told you about three years ago, and now you need to hear us. And to the extent the district court at that juncture said no, you'd be well within your rights to tell the district court to take a different view. Mr. Beckman, do you have any estimate as to how long we're talking about? When is the baseline monitoring going to be? I'm glad you asked that, Your Honor. Basically, this was supposed to be done around 2004. But as Mr. Montevideo alluded to, he filed a separate state adjudication, prevailed on a couple of state law claims, lost on others. And so the entire process of implementing this TMDL has been stayed by a state court order. Now, that's now on appeal, so that state court proceeding is not over. But I would suggest that for purposes of the rightness analysis, that the fact that nothing is happening by state court order to implement this TMDL, which we're not happy about because the trash continues to float in the ocean, but that is the reality we're faced with, is a fact which you can take judicial notice of and should for purposes of affirming the district court's decision. Are the cities subject to greater and more expensive compliance if they wait two years than if they start to do it now? I don't think so. In fact, I think because their allocations haven't been fixed, I don't know how, if one does not know yet what obligation they have, what numeric amount of trash, how many tons within their jurisdiction. Remember, it varies under the TMDL. They don't know what that limit is. I don't know how they can begin to address their ultimate obligation. And I think that the district court was well aware of that factual development. You had asked counsel earlier about, well, isn't this right now or as right as it will get? And not on this point it's not as right as it's going to get because the numeric responsibility, how much trash has to be reduced, the associated costs, and the way in which the cities are going to address the problem still has not been fixed. No matter how those things come out, it really has nothing to do with whether the EPA has the power to accept a state TMDL after it's established one of its own or whether it can designate a whole watershed. I mean, none of those results that we're waiting for have anything to do with those issues. Well, that's true, Your Honor. But let me just review where we are with the case because only a certain number, a certain part of this case was dismissed as unright. The points you just made, the question about whether, for example, EPA has the ability. You're right. Yes. That was dismissed for failure to state it. That's right. So I think the district court did recognize the point that you're making and resolve the matter in an appropriate way. It did deal with. That was the one on whether they could accept a new state limitation, I think, wasn't it? That's exactly right. And whether the process, whether there was a process. Now, that was no final order or something. Yes, exactly. So the district court did deal with the merits on those issues which were. So the ones that it didn't issue, one was the watershed. The watershed? And the estuary and the other associated substantive claims that were in Petitioner's Second Amendment complaint. Only two of which were before the district court under Mr. Montevideo's summary judgment motion. We had battling motions here. And Mr. Montevideo filed a summary judgment motion on the estuary claim and on this urban watershed claim. Those were dismissed as, that motion was dismissed as moot based on the rightness, okay? So what I wanted to emphasize, though, is that with respect first to this issue of billions of dollars, it is true. The TMDL estimated the platinum approach to trash removal, which I think was a conservative approach that they decided to take. In other words, they said, let's take the most expensive technological fix. And what they basically came up with, the record reflects, is massive washing machines, basically. They get dropped into the ground, they spin around like a centrifuge when water flows through, and the trash sticks to the side like a washing machine. Okay? To say that that is the cost that any one of these cities, or all of them, will face is a pure hypothetical issue. It would be as if you asked me, what does an automobile cost? And I said, it's $500,000 because that's what a custom-made Porsche costs. Well, it may be that I drove here today in a Toyota, and in fact I did. And that's the analogy that applies here. The number in the TMDL is the most expensive for the platinum fix. It is not, and the TMDL recognizes and encourages, multiple approaches like nets, which are very inexpensive, like education, like boarding up storm drains during the dry season. And so, I think the district court properly recognized, not only that those numbers were not properly before it, but even if they were, the alternative ruling was that those numbers did not apply and demonstrate harm for the plaintiffs or any one of the plaintiffs. If I could just make one other point. Let me figure out how much you would allocate to Arcadia. You can handle that population? Since they sued, I'd like them to do all of it. Your Honor, the way it works is the regional board, and this is in the TMDL. If you'd like to issue that order, I'll prepare it. What's wrong? The serious answer to your question, Your Honor, is what the regional board did, and an exercise, I think, of technical brilliance, really, is they looked at trash generation rates over different types of landscapes in the urban area. Industrial, commercial, residential. And they came up with a numeric hypothesis, or not a hypothesis, but a theorem. And they basically said that each city can do one of two things in terms of figuring out what it has to do. One, it can actually monitor and figure out how much trash really is being discharged, and then it can reduce from there, 10% a year over 14 years. Through the storm drain. Yes, exactly. Let me finish this point, and I'll get to the other point. The other way you can do it is just to apply this theorem, which it makes certain technical assumptions about trash generation. So, they have two choices. Actual monitoring, or sort of an assumed baseline, based on the regional board's technical analysis. So, it will vary from city to city. If you're out in Arcadia, which I think we'd all agree, those of us anyway who live in the area, it is a less industrial part of the Los Angeles space. And you're going to get a different generation rate than you will maybe, you know, outside the Staples Center in downtown Los Angeles after a lake disaster. And the regional board recognized that, and the TMDO recognizes it. The issue of immediate applicability because of a lawsuit. But Arcadia has the horses. That's true. But that's for a different TMDO, Your Honor. That's the sludge TMDO. I thought I saw something in the briefs of the city saying that, well, if we're supposed to reduce 10% a year and so on, and this thing doesn't kick in until four years from now when they finally tell us that it's got to be written into the permits and so on, and they figure out how much should be, we may have to do 40 or 50% the first year. Well, I think that that's... Because it's 10% a year from now or from yesterday or something. It's 10% a year with the first compliance date in 2006 if there's no change through the re-opener. And even that 10% a year is on a rolling basis. So they can miss that limit in any given year on a rolling basis as long as they make it up within a three-year period. So I think the point of your question is don't they have to do something now in order ultimately to meet that compliance point? And I think the answer to the question is no. And especially because the monitoring was still ongoing, they don't even know what they have to do. The whole point of the TMDL that we in part agreed to, even though it was going to take so long, was to allow a reasonably accurate fix on what each city's obligation was. And you can't know that until the baseline monitoring is over. TMDLs are not enforceable but for the fact they exist in an NPDES permit. That is not a disputed issue or it should not be. If there's a dispute about it, it's a frivolous dispute. Nobody can sue with good reason or with bad reason, any city, whether that's a government lawsuit or a citizen suit, until the NPDES permit to govern stormwater discharges is amended by the regional board to fix a requirement under the TMDL. They're interrelated. The permit and the TMDL function together. The permit implements the TMDL's numeric calculation. So the prospect that somebody willy-nilly can come up and sue a city right now is erroneous. And I think a basic review of 303. So the current permit does not adopt any TMDL? That's right. It's trash anyway. That's correct. The current permit, which is before the court administrative record, which is valid through 2006, like all NPDES permits, has no allocation to any city for trash. They have no reduction obligation. Does the permit say something about the TMDL being adopted? It recognizes that TMDLs can be adopted, but everybody agrees that you have to amend the permit before the TMDL becomes obligatory. So the fact that EPA adopted a zero TMDL has no practical effect on these parties today and may not ever until the TMDL is into the permit. Thank you very much, and I appreciate the additional time that you've given us today. Well argued. Thank you. Thank you. Yeah, you look like you could use it. Let me just quickly start with the last argument that was raised in terms of the permit does not require compliance today and does not implement the TMDL. This is on page 292 of the permit. It provides that discharges from the MS for the cause or contribute to the violation of water quality standards or water quality objectives are prohibited, period. There's nothing else in this permit that takes away from this obligation of the permittees to comply with the TMDL. Secondly, on page, excerpts of record 285, it says the trash TMDL, this very particular TMDL, will be effective and enforceable upon EPA approval. Thirdly, and I guess I'm asking for reconsideration, we had made a request for judicial notice of a public document. And this document is the staff report that was submitted by regional board staff in connection with the TMDL. It's a fact sheet, I believe. That fact sheet provided as follows. I quote, upon approval of a TMDL, implementation of municipal stormwater requirements specified in that TMDL will become effective and enforceable under the permit. In other words, municipal stormwater requirements will be automatically included in this proposed permit upon adoption of a TMDL by the board without reopening this permit. That's on page 15 of Exhibit A to our request for judicial notice. So, they make these arguments now. But the record that was before the district court showed, not this document, but the permit itself showed very clearly that these cities are obligated to comply with the TMDL as soon as the thing was adopted. Now, the argument that, well, your compliance states, there's going to be some monitoring that's going to be conducted and that will change the TMDL. That monitoring does nothing but change the baseline. The monitoring does not change the 10% reductions. Those reductions are firm. They begin, if you look at the excerpts of record, page 166, it has compliance dates for each year beginning with October 1, 2003. We're now into the second year of implementation. Nothing is going to change those dates. But you haven't had to implement anything, have you? We would have had to have implemented, but at least this is to most of these cities involved in this lawsuit. But not all. They have protection because of our state court action. You got an injunction, right? We did not get an injunction, Your Honor. We prevailed in the lawsuit on some of the same issues that are being addressed here. The matter was automatically stayed on appeal. We then moved to lift the stay. And what the court said was, contrary to what was represented, the court said, as to you petitioners, we're going to lift the stay. So, the judgment will remain in place. To the rest of the county, so the decisions that EPA has made with respect to this TMDL are final, they're concrete, and those decisions are having impacts throughout the county. To say that nobody is taking any action is ignoring reality. We never were given the opportunity to get into any discovery to challenge Mr. Dickerson's declaration. But I can represent to this court that cities are taking action today to comply with this TMDL because they can't wait until the third quarter to get in the game. They can't wait until 2005 or 2006 to start complying. By then, they're going to have to be in 30% compliance, according to the schedule. By the end of, by September 30, 2006, there has to be a 30% reduction in traffic. To see what part of their point is that you don't yet know 30% of what. Okay, but does that mean we can wait and do nothing? I guess the argument is, what is it that they are saying we have to do? Is the do-nothing alternative, regardless of what it's going to cost, if it costs a dollar, it's something. But it's going to cost much more than a dollar. But the argument I guess they're making is, we don't have to do a darn thing to comply with this TMDL, whether it's the Cadillac approach or the Toyota approach. We have to do something. We can't start playing the game in the third quarter. This thing has express compliance deadlines. And if we wait until 2006, no responsible public official is going to do that. Not only because we're going to be sued by Mr. Beckman, but secondly, the public is going to demand that we do something if we have an obligation to do something. Beckman has just indicated he's not going to sue you. I haven't seen the stipulation in writing. In fact, he's litigating, Your Honor, very hard in state court on this very clause to say he should have the right to require us to strictly comply with all water quality standards. Let's confine the argument to the issues before us. That's enough for one day. The point is that we may have an option of cleaning the streets or putting in these vortex systems, but we don't have the option of doing absolutely nothing. And that's really the point they're trying to make to this court. Finally, they haven't addressed the procedural injury issue. There is this, whether or not they have the ability to approve a TMDL that applies to an unlisted water body or to the entire 584 square miles. Clearly, they recognize that the state was required to give notice on how those TMDLs are to be calculated vis-à-vis the entire 584 square miles of the watershed. Where was the notice? They gave us notice of all sorts of documents before. We attended hearings, but never once did they say, we're going to apply this thing to the entire 584 square miles. They waited until after all the hearings were concluded. And two days before the EPA approved the thing, to slip in, and they didn't publish this notice, to slip in this notice and say, oh, by the way, we are drastically expanding the application of this TMDL. There is an immediate procedural injury that occurred at that point in time, and the case with respect to that procedural injury could never be riper. Similarly, with respect to the other legal issues, there's nothing else that's going to happen that's going to interfere with judicial review. And even EPA's actions, they're done. The state is done. The argument that, wait a minute, maybe possibly, which is what the district court said, at some point in the future, this thing may change. But it may not change. And what happens then? Let me ask you a question. Is there anything in the consent decree that would, in other words, you know, if you're confronted with a terrible situation that's been thrust upon you, and it's unfair, isn't there a provision in the consent decree to go to the judge and get relief? Your Honor, there is. The consent decree, we have not challenged the consent decree. The consent decree contains a provision that nothing within its terms is to be construed as being contrary to existing law. The consent decree could not, even if the court had wanted to do that, which I'm sure she did not want to do, could not have changed the Clean Water Act. If EPA had an obligation to wait until the state submitted a TMDL, that obligation would exist irrespective of the consent decree. If EPA had no authority... What we're talking about is, you know, we're talking about this 10% a year, and then you're worried that all of a sudden you're going to have to catch up with the 40%. The consent decree... I understand the point you're making. Yes, but the consent decree does not help us. The consent decree says nothing about the 10% requirements. It only gives dates as to when... I know, but then you can go before the judge and present that matter, and she's got the authority to rule on it. There's got to be flexibility in there. That's the problem, Your Honor, there is not. Oh, I'd be surprised. The consent decree includes hard and fast deadlines for EPA to adopt the TMDLs. And what's interesting is EPA met the deadline, we don't think, in accordance with its authority and consistent with law. But then they said, okay, we met the deadline, and the interveners agree. Okay, you guys can sit back and do nothing for four and a half years. It's not credible. You know, we're hearing the same thing. Yes, yes. But in response to the Court's question, there is nothing in the consent decree, as I read it, to provide these municipalities protection with respect to implementing the TMDL. One would have to look at the TMDL itself. The TMDL has express compliance dates. We also have the permit that says... You're talking about an opportunity to go before the judge and get an adjustment that way. To modify, Your Honor, the consent decree? Well, to give you relief on whatever your problem is at the time. I think my relief is what I'm seeking now. If we have a TMDL that we believe was inappropriately approved by EPA, I have to challenge EPA's approval of the TMDL. So that's what I've tried to do. I believe this TMDL is defective. Yeah, we know that. But the point is, we are trying to do that now. We can't wait until later and do it under the consent decree, because that would be considered a collateral attack, unless there's any other questions. I'm not talking about an attack on a consent decree. I apologize, Your Honor. We're going down different storm drains. Yes, maybe I did not understand the Court's question. Okay. Thank you for your indulgence. Okay, one final thing. Yeah. Just for clarity, it is very important that we don't make these battles more interesting. The consent decree just requires EPA to establish TMDLs of certain importance over a period of time. It doesn't specify what the TMDL is. It doesn't say zero trash. It doesn't say some trash. It doesn't say a hundred times a trash. So about one thing that Dramato and I, I think, agree today, and that is the consent decree is a procedure, requires the procedure without the TMDL. It doesn't specify the 10% or any other, and so Mr. Milandale is properly in the right court through this case in arguing about the substance. Now, this case is effective, but it would not be appropriate for him to go back to the other judge on the consent decree, because that consent decree doesn't specify the substance of the TMDL. So if he's complaining about zero or 10%, the consent decree is not the place to go, because all it does, again, is require the TMDL to be adopted. It doesn't say what they have to be, and it includes provisions saying, in fact, that the consent decree does not give the court, the district court, the right to review the substance of TMDLs developed under the consent decree. So it's a procedural versus substantive challenge. Thank you. Okay. That's it. Submitted. See you later. Take recess until 9 a.m. tomorrow morning. All rise. This court for this session stands adjourned. Go ahead.
judges: Pregerson, Canby, Tallman